Our next case on the calendar is the United States v. Barajas-Oceguera. Henderson, you can start whenever you're ready. And if you want to reserve some time for rebuttal, please watch the clock. Thank you, Your Honor. Good morning. May it please the Court. Sodom Henderson for the appellant, Francisco Barajas-Oceguera. I'd like to reserve three minutes for rebuttal and I will watch my clock. This is a case about an overzealous officer cutting corners, in this case literally, and conducting a warrantless search for sealed package, rather than seizing the package and seeking a warrant as the law requires. I'm planning to focus my argument on the claim that the driver of the truck that had been transporting the package had actual or apparent authority to consent to Officer Diaz's search, because that's where the district court rests with its erroneous denial of the motion to suppress. But obviously... Counsel, I have a more fundamental problem with this case. Sure, Your Honor. Why didn't you guys put any evidence into the record? It seems to me that when a case is called for argument on a motion to suppress, the standard way to handle it is to hear testimony from all of the relevant parties. Instead, the district court just kind of, I guess, what, gave a tentative ruling and then you all argued as to how the court should come out, without actually hearing any live witnesses talk about what they did or knew or should have done? I mean, Your Honor, I didn't handle the case below. I can't speak to why the evidence... You read the same record I had, although to call it a record, I think is a misnomer, because it's a legal argument. It's a transcript of a legal argument. It's not a motion to suppress hearing. Our office often does not get, in this district at least, doesn't get evidentiary hearings and suppression motions unless there's some dispute of fact. I mean, I suppose I had to defend the meager record. It might be on the lines that Mr. Bonneras wasn't there when the officer searched, so he couldn't contradict what the officer had to say. So there's not a dispute at that point. And I take it the truck driver was not available to answer questions about what his authority was from Old Dominion? I have no idea. I mean, the only thing I'd say about that is this is the government's burden to prove consent, and if he's not there, I'd ask the government why and not us. Well, yeah, but you have to put factual issues in contention, which I assume you attempted to do with the declaration, although even your client's declaration is pretty thin. Well, we confirmed that it's his box and his storage units. And he rented the storage units. Yeah, so it's not clear what else we should have been putting in. And, you know, to the extent that there are things missing, and I think I pointed them out in my briefing, again, I would ask you to hold that against the government because it was their burden. I intend to ask the government why the same questions. Okay. So if I may, moving on to actual authority here, because that is, again, where the court centered its ruling. Under this court's case law, a third party like the truck driver here has authority to consent to a search of property only if the third party has mutual use of the property and joint access and control for most purposes, or the property owner has expressly authorized the third party to give consent. And here the Old Dominion driver didn't share mutual use of the property and have joint access. He's not a wife or a girlfriend of the property owner like you see in Matlock, Brannon, McAlpin in these cases the government's citing. Those were all people who cohabitated with the defendants and consented to searches of spaces that they shared in common. Here the driver didn't cohabitate. He didn't co-own the package. He didn't have any rights to use it or its contents. His only relationship to the package was as its contracted transporter. And so in that respect, he is precisely like the TWA employees in this court's en banc decision in Cornwall where the defendant shipped a package first via air freight. TWA employees allowed law enforcement to search the package. But despite TWA having a provision saying we, TWA, can search, this court found that that provision wasn't sufficient to allow them to consent to law enforcement searches, that they separately needed the consent of the sender in order to allow a law enforcement search. That's an en banc decision of this court. It's never been overruled. It controls this case on the issue of actual authority. Would a truck driver have potential liability for possessing controlled substances that are cargo in his truck? Unless he knowingly possessed them. I don't know how he could. Well, there was some suggestion in the record that the truck driver was concerned that he was responsible for the contents of your client's package. And that that was one of the reasons why he had made an initial cut into the package to see what it contained. But, again, we don't have any testimony from the truck driver. We don't. And if anything, that might, you know, if there was such a requirement that might give the truck driver the ability to open the package himself, it doesn't answer Korngold saying that the truck driver, I mean, the TWA employees would presumably have the same responsibility. But this court found that they had no right to allow law enforcement to search absent the express consent of the Senate. Would you concede that had the truck driver done everything himself without any direction from law enforcement and discovered the money, that at that point the agent could have seized the currency as potential drug proceeds? At that point, the currency would have been. So if the truck driver just cut the thing himself, everything's open driver, the police officer doesn't interfere in any way. It's all private action. And at the end of the private action, it's in plain view. Yes. Then this would be a different case. But that's that's that's not the case. All right. Okay. So that that's all right. Can you address the inevitability doctrine here? I mean, obviously, it's very suspicious, at least to the truck driver, that this cabinet being shipped at a very high cost. And he opens it and there is a wrapped package. I mean, wouldn't it have been likely that DEA, when the package ultimately arrived in California, that they would be ready then with a warrant to inspect it? So inevitability, Your Honor, it doesn't look at whether it's likely that the DEA would have. They have to show that it's inevitable, that the DEA certainly would. And the DEA, we have the government's kind of said, oh, DEA routine procedures. They would do this, but they don't put those routine procedures into evidence. We have no idea what the DEA actually would have done. If all the DEA is hearing is there are some tape wrapped packages. The dog didn't alert on them. I think me, this officer in South Carolina, thinks there's something fishy about this. Would the DEA have taken its resources and staked out the surveillance? It's a very different situation from knowing that it's $100,000 in cash and that a drug dog positively alerted on the package once it had been cut open than just to say that there are these tape wrapped packages. I mean, at that point, the DEA wouldn't even know whether they were drug proceeds, as opposed to, I mean, even if they knew it was cash, they wouldn't know it was drug proceeds as opposed to some other proceeds. And they don't know what's in there. So to say that the DEA is just going to react to a report from South Carolina about tape wrapped packages with this large response, absent any evidence about that, is I think just speculative. And I mean, I think an overall point about these fruit of the poisonous tree doctrines is that the district court doesn't rule on these. These are really fact intensive inquiries. And this court has generally said where there's no ruling from the district court on these fact intensive issues, you know, it should go back and the district court can do fact finding in the first instance and could look at what are the DEA's procedures and, you know, what would the DEA actually have done in this situation, not just speculating or, as the government tries to do in its briefing, claiming that the information that the government had before the search was the same or virtually the same as the information that it had after the search because that's just clearly not true. Before the search you had no idea that it was $100,000. That's a large amount of money. That's the kind of money that would get the attention of an interagency task force or something. It's not peanuts. So you wouldn't object if we reversed and remanded for an evidentiary hearing based on the paucity of facts in the record? I mean, of course I'd prefer if you reversed and remanded on a closed record. No, no, I understand that. But you do agree that one alternative is to send it back and ask Judge Wright to conduct a more fulsome evidentiary hearing. What would be the facts that he would have to go into? So if we're talking about inevitable discovery, it would be what the DEA's routine procedures would be upon receiving a report of 12 tape-wrapped bundles that did not alert to a dog sniff coming in a truck across the country. Did the dog sniff the bundles, or did the dog sniff the box? The government did two dog sniffs. The first dog sniff, it sniffed the closed box. So it didn't do a dog sniff of just the bundles before they were opened. It sniffed the closed box, and it had some sort of reaction, but even Officer Diaz admits it wasn't the right reaction. It didn't actually alert. And then later, after Officer Diaz goes ahead and cuts into the bundles and finds the money, they have the dogs come back and sniff the open bundles, and the dog alerts at that point. Your position is, I take it, that there should have been a warrant once they saw the bundles. My position is that the constitutionally reasonable thing to do would have been to get a warrant. If he's worried about the driver's safety, Officer Diaz says he cuts into the bundle because he's worried about fentanyl, the possibility of fentanyl or some horrible thing coming out of the bundle. If he's worried about that, constitutionally reasonable thing to do is to seize the bundle, to get a warrant, and then cut it open with the warrant. We wouldn't need any fact-finding if we were to agree with you on that. You wouldn't need any fact-finding? Well, if you were to agree with me on that, there was a constitutional violation. The government would still be arguing it's not fruit of the poisonous tree, that it would fall into one of these exclusions to the fruit of the poisonous tree because the thing he was actually convicted for were the drugs that were found on May 9th. But wouldn't there also be a material issue of fact over the driver's involvement in the opening of the package? I mean, it's still murky, in my mind, as to whether or not the agent just sort of stood there passively while the truck driver did whatever the truck driver did, opened the package to some extent, and produced the bundles. And then the agent says he didn't want the truck driver to open the bundle because he was afraid it might contain fentanyl and therefore produce a drug overdose on the part of the driver. Yeah, I mean, I certainly would like to hear what the driver had to say and whether this was as complete a private action as the government described it. We just don't know at this point what the answer to my question is, what the role of the truck driver was. No. Okay. I see that I'm low on time. I'd like to reserve that rebuttal. Okay. May it please the court, Benjamin Weir on behalf of the United States. The government set forth several reasons in its brief why the district court's opinion below should be affirmed. I'd like to focus on two of those here today regarding standing and the automobile exception. While also getting into some of the questions that the court has raised thus far here today. Regarding standing, the defendant's conduct was designed to completely remove himself from any apparent ownership, control, usage of the property, and of the package. After taking these actions, he had no reasonable expectation and privacy in that package at the time it was searched by law enforcement. He did not give the package to the freight driver. The bill of lading listed two fictitious business entities as the shipper and recipient of the property. The defendant was not listed. While there were addresses for those fictitious business entities listed, those addresses belong to two storage businesses. There was no specific unit number for a storage locker listed on the bill of lading. At the time of the law enforcement search, there was no possibility to tie the defendant to the package because there was no way for law enforcement or anyone to know that that package belonged to the defendant, was tied to the defendant, owned by the defendant, or he shipped it. There was no nexus between those two things. But there's no indication that the defendant gave permission or suggested that other people would have access to this, right? That's correct, Your Honor. He gave it to a freight company as a bailee for it to be shipped across the country. It was to be delivered to someone other than him. Johnson C's was the name of the fictitious business entity. So suppose, let's put a different context, let's say an email context. Someone opens up an email account, uses an alias, not his real name, and sends emails, but there's no indication the person is allowing other people access to his email account. I mean, that person still has some expectation of privacy even if he uses a fake name. Well, I think the difference here is a couple things, Your Honor. The expectation of privacy in your hypothetical wouldn't be to the entire email account in toto. It would be the actual individual email that was sent out to somebody else. This isn't a circumstance where law enforcement went and searched everything related to this alias email account of an individual. It was a singular package where the defendant had completely disclaimed any relationship and interest in that package as part of his criminal scheme so that it couldn't be tied to him. And that disclaimer is one that society shouldn't recognize. It's not one where it's objectively reasonable to expect that you're going to do everything in your power to hide any tie and relationship to a package, but then still say you have a First Amendment expectation of privacy in that. When you've done everything to show, that package doesn't belong to you. What if the recipient recognizes you're using an alias name? Both sides recognize that we're going to use aliases and that's how we're going to communicate or ship things. Well, if both sides use aliases and that's a publicly known alias to a group of people in the public, that's a different situation than here where there is a fictitious business name. There's no evidence it's ever been used in the past. It can't be tied to anyone. The shipping company certainly didn't know these businesses were fictitious and were unrelated to the defendant. So if there's a pet name for someone or a nickname that you use to ship and other people know that that name can be tied to the person, it's still reasonable to believe there's going to be privacy in whatever is being sent. If on both sides of the transaction, that alias is completely cut out of whole cloth and fraudulent, why would anyone believe that that is still private to them? It's in furtherance of a criminal purpose. That's the whole reason why they changed the names to begin with. And that's not a reasonable expectation that you can and should be able to do that and still shield yourself from law enforcement when you're doing everything in your power to hide it. And the defendant bears the burden to establish standing through appeal. His affidavit below merely stated that he rented the two storage lockers. There's no statements regarding the false businesses. There's no statements regarding ownership or agency as to those businesses. And presumably, that's because he couldn't make any such showing. According to the bill of lading, the standing would be by these two fictitious entities. And the defendant's sole argument in his reply brief against the government's standing position is a reliance on the Gonzalez case. And the defendant acknowledges in the brief that if one sends a package to a name other than themselves or the intended recipient, they may disclaim their interest in that package. But if it's sent to a business name, that's an entirely different thing than an alias or a fake name because it's a business. But here, the facts couldn't be more different than Gonzalez. In Gonzalez, there was a legitimate business. It was family-owned. It was closely held. That business had no more than 25 employees at its peak. It operated at a piece of property. And the defendants in that case owned that piece of property. The court found that a family-owned business would have a reasonable expectation of privacy in communications happening on the piece of property owned by the business, owned by the defendants, when those communications were being done in furtherance of the business as agents of the business. Here, we do not have a single fact that squares with the Gonzalez case. We have fictitious businesses. We have no legitimate business operations. The search did not occur on business property owned by the defendant. So, Gonzalez really provides no support to the defendant's standing position because there's no factual similarity between our case and Gonzalez. Moving on to the automobile exception, there's no factual dispute at issue in this case. This was a package that was on a freight truck that was going to be moved from South Carolina to California while the truck driver had removed the package from the truck at the time that law enforcement arrived. There's no factual dispute that, absent search or seizure by law enforcement, that package was going to be re-put on the truck and shipped across the country. Counsel, at that point, the package could have been seized while a warrant was obtained, could it not? Your Honor, it could have, but the Fourth Amendment does not require that the government avail itself of the first opportunity to obtain a warrant or find some permissible Fourth Amendment conduct. I mean, the automobile cases usually involve the defendant either driving or being present in the vehicle in which the package is contained and the court in, I can't remember the Supreme Court case name, I should, but that was the Whiskey case, if I remember correctly. The court basically recognized that the car containing the incriminating contraband could be driven off before there would be time to get a warrant. Here, the shipping company itself has offloaded the package because the truck driver's concerned that it might contain contraband, and I just don't see that this is an automobile exception case. Your Honor, while most automobile exception cases do involve personal cars, they do apply to trucks, they do apply to freight companies. The Johns Matter cited in our brief is one where it was a shipping truck, freight truck, and it wasn't a personal vehicle. So there was a contractual obligation by the freight company to move it across the country. So I think absent seizure by law enforcement, I don't think there's a factual dispute that this box would have been put back on the truck and shipped across the country. So the government believes the automobile exception does apply here. Okay. Can you answer the question I asked Mr. Henderson? Why didn't you present this in the form of evidence, testimony? Why didn't you call the truck driver and the agent to tell the court what happened? Your Honor, we submitted an affidavit by the agent in South Carolina who sliced open the one bundle, and that set forth the facts that he experienced, and the government believes there's no dispute of facts based on that affidavit that there was apparent authority and it was reasonable for the law enforcement officer to conduct that search. I'd like to note that... I also want to hear Mr. Henderson saying he definitely disputes that the truck driver had apparent authority to consent to the search, and we never heard from the truck driver to tell us what he did. I think it's important to note that the defense never asked to question the law enforcement officer during the suppression hearing. He was present. The court asked one or two very pointed, short questions of that law enforcement officer. During argument, the defendant never asked to question, never said there was any questions of facts, any facts in dispute in this matter. Was the officer sworn? Or was he just on the phone? He was on VTC, Your Honor. The record does not reflect that he was sworn during the recorded portion of the hearing. The law enforcement officer stated that the driver told him he was responsible for what was on the truck, and he needed to know what was inside. When the law enforcement officer told him early on that the government did not have probable cause to search the package, he then watched as the driver opened the package, and the law enforcement officer's affidavit stated that he did not direct or request the driver to do anything to open that package. That fact was not disputed by the defendant below. Why didn't the agent have to get a warrant once he saw that there were these packages that were all wrapped up in the way that drugs and drug-related material are wrapped? Your Honor, as the district court found, there appeared to be apparent authority on behalf of the driver to consent. And the apparent authority was based on the fact that the driver himself opened four layers of packaging prior to getting down to the bundles. There was shrink wrap, there was a box, he opened the cabinet, there was another box, he then opened that. That makes it clear or seemingly clear to the law enforcement officer that the driver has the ability and authority to look at what is inside his truck. Indeed, that's what the driver told the law enforcement officer, is that he's responsible for what's on his truck. And as the government noted in its brief, that bailees have a common law right to inspect to ensure that they don't transport contraband. And that's what was happening here. And the defendant based as much of his argument on foreign gold about whether or not the contract between the defendant and the shipping company permitted a search of the parcel. And that's a mistake of fact there that perhaps the driver had that authority. And he seemingly did have that authority because he was actually doing and taking those actions directly in front of law enforcement officers. And if he was not entitled to do that, why would he be doing that in front of multiple law enforcement officers? It was reasonable. It's based on the facts and circumstances surrounding what the law enforcement officer knew at that time. And everything was suspicious from the pickup to the way the package was wrapped to the way it was uncovered to there being 12 mysteriously wrapped packages and electrical tape, which the law enforcement officer knows from his training and experience is often used to ship contraband or proceeds of contraband. Based on all of those things, it's reasonable for the law enforcement officer to do what he did in your honors. And I see that I'm out of time, so I will request that the court affirm and will submit unless your honors have any further questions. Thank you, Mr. Henderson. Thank you, your honor. I want to hit more than what I have time for, but I'll try to get through standing in apparent authority at least. In terms of standing, the government's wrong in ways that I can state more clearly than I did in the briefing. Sorry, your honor, are you speaking? Go ahead. So there is case law saying that if a defendant uses the name of some actual other person, a real person, like Judge Lee was getting at with his discussion of alias emails, if you use someone else's real ID so that you're essentially stealing their identity, you give up your reasonable expectation of privacy because you're creating a risk that the package is going to be delivered to that other real person or real company. But the case law also says that if you're using a fictitious name, you actually retain your expectation of privacy because you're not creating a risk that it's going to be delivered to some other real entity or real person because there is no other real entity or real person. It's just your alias, your alter ego. So the government's own evidence shows that the list of sellers... But counsel, this is not a situation like in California where you register a business entity as a fictitious name so that authorities know who the true owners are behind the business. This is a completely made-up name that your client conjured and apparently rented a storage unit in the name of this fictitious entity that doesn't exist. And if Your Honor were to look at the... There's a Fifth Circuit case that I believe Judge O'Scanlan points to in his honor called United States v. Villareal. If he doesn't point to it, he points to a case that points to it. That one is a 55-gallon drum being delivered to a terminal under a fictitious name, Roland Martin. But the fact that it was an alias and it was not somebody else's real name was enough to preserve standing for the Fifth Circuit. It's... Again, if there's no other person who's going to get it because... But in that case, did the defendant acknowledge that the business was his? Because here your declaration doesn't say anything about the businesses, does it? No, in that case, I don't know what the defendant acknowledged versus what was proven by the government, but the name Roland Martin, it wasn't a business name. It was an individual name. And that was just a fictitious name. And that was good enough. And then there's another... Well, just to put that in the record, that's USA... But I'm looking at his declaration, paragraphs one and... I guess it's one. He says, I was the tenant. But that's not true, is it? The actual tenant for that storage unit was a fictitious business name. I'm not sure that the business name was the tenant. I don't know that there's anything in the record other than his statement about who had rented the... I don't know that there's any evidence that it was rented to that business as opposed to him. I don't know that we have the name of... Okay, so all we have is, I was in a month-to-month lease and I paid my rent for that. Yeah. But we don't know whether the unit was in his name or the fictitious business name. We don't, but it's also... When you're picking up something from a storage unit, it's not like an address. Storage units are all locked, so there has to be someone there to meet the driver on both ends because you can't just dump something at a storage unit. It's hundreds of units that are all locked. You need to be there. And he was there to get it. And again, so he's claiming it that way. He's claiming it here when confronted. And these are fictitious names as opposed to identity stolen names. So under the case law, he should have standing. Just if I can quickly throw in a couple words about these other issues. In terms of the automobile exception, I don't think the government points to a single case where there's, or they don't, where the freight not on an automobile when police found it is subject to the automobile exception. With regard to apparent authority, Officer Diaz never claimed that he thought the driver had authority to consent. The only thing he says is, oh, well, you know, the driver said he was responsible. Responsible could mean anything. Every driver is responsible, right? They're supposed to get the thing to where it's going. Even if he thought that meant that the driver could cut into the packages himself, Korngold tells us that that is not enough to give him consent. And for apparent authority, you need a mistake that would, if not a mistake, would actually give you actual authority. And because there's no claim that Officer Diaz thought that there was, the driver had authority to consent given to him by Mr. Barras, or any sender, there's no apparent authority. I'd like to have any other questions. Great. Thank you for the very useful arguments. This case has been submitted. Thank you. Thank you both. Thank you, Your Honors.
judges: SCHROEDER, TALLMAN, LEE